# Exhibit "A"

**FINANCIAL INDUSTRY REGULATORY AUTHORITY**
**OFFICE OF DISPUTE RESOLUTION**

| | | |
|---|---|---|
| In the matter of the arbitration between: | : | |
| | : | **Arbitration No.** |
| JACQUELINE E. EISENBERG, | : | |
| | : | |
| Claimant, | : | |
| | : | |
| v. | : | |
| | : | |
| EMANUEL L. SARRIS, SR. ANTHONY J. | : | |
| SARRIS, FIRST FINANCIAL RESOURCES, | : | |
| INC.,  SARRIS FINANCIAL GROUP, INC. | : | |
| SARRIS/FIRST FINANCIAL, and | : | |
| ROYAL ALLIANCE ASSOCIATES, INC. | : | |
| | : | |
| Respondents. | : | **STATEMENT OF CLAIM** |
| | : | |

Claimant, Jacqueline E. Eisenberg ( "Ms. Eisenberg" or the "Claimant"), by and through his undersigned counsel, Nicholas J. Guiliano, Esquire, The Guiliano Law Firm, P.C., 230 South Broad Street, Suite 601, Philadelphia, Pennsylvania 19102, for his Statement of Claim alleges:

## I.    SUMMARY & OVERVIEW

1.    Claimant brings this action against the above captioned Respondents in connection with the recommendation and sale of unregistered securities (a "Ponzi"scheme), in violation of the federal securities laws and the Delaware Uniform Securities Act, and for common law fraud, the failure to supervise and breach of fiduciary duty.

## II.    THE PARTIES

2.    At all times relevant hereto, Claimant is a public customer and is a resident of the State of Delaware.

1

3.     Royal Alliance Associates, Inc.  ("Royal Alliance") purports to be "one of America's largest networks of independent broker-dealers," with more than "1,500 "independent" financial advisors operating from more than 200 geographically dispersed "franchise" branch offices across the United States.[1]   Royal Alliance is a registered broker-dealer with its principal place of business at One World Financial Center, New York, New York 10281.

4.     Emanuel L. Sarris, ("Manny Sarris"), among other things, is a "Registered Financial Consultant" or "RFC," and also a "Certified Investment Specialist" or CIS.[2]  Manny Sarris also purports to be a "licensed registered representative with Royal Alliance Associates," and the "founding principal" of First Financial Resources, Inc. (Exhibit "A").  Manny Sarris, together with his son Anthony Sarris, conduct business as "First Financial Resources, Inc.," "Sarris/First Financial Resources" and as the "Sarris Financial Group, Inc." from a Royal Alliance branch office, which at all times relevant hereto, was located at 54 Friends Lane, Newtown, Pennsylvania 18940.

---

[1]     In substantial part, these offices are "franchise" offices wherein the broker pays all the expenses, in consideration for a higher commission pay-out.   However, there is no on-site supervision at these geographically dispersed, remote locations.  As such, Royal Alliance, is also substantially unable to directly supervise the sales practices or activities conducted at these "independent" offices, and since its inception, Royal Alliance has been subject to numerous regulatory actions for the failure to supervise, in addition to numerous customer initiated, investment related complaints, or arbitrations, alleging the failure to supervise and fraud in connection with the sale of securities. *See, e.g., In re Royal Alliance Associates, Inc.*, 63 S.E.C. Docket 1601 (Jan. 15, 1997)(inadequate system of effective supervision over geographically dispersed brokers).

[2]     The "RFC" designation is available to members the International Association of Financial Consultants, (located in 6784 Ayala Ave. cor. Rufino St., Legaspi Village, Makati City, Philippines 1229). The "CIS" or Certified Investment Specialist designation, appears to be a designation conferred upon the members of Investment Management Consultants Association (IMCA)(*See also*, FINRA Notice to Members 07-43, Sept. 2007 ("proliferation of professional designations")).

5.      Manny Sarris has an extensive history of customer initiated, investment related complaints and FINRA arbitrations alleging fraud and deceptive sales practices, and has also been the subject of at least three (3) regulatory actions, and certain disclosed investigations by state securities regulators for fraud in connection with the sale of securities and insurance related products. Manny Sarris is also a registered investment advisor, however, according to SEC records, his Sarris' investment advisory activities are limited to "occasional calls from past clients" for whom, without compensation, he "provides general / nonspecific advice."   (Exhibit "B").

6.      Anthony J. Sarris ("Anthony Sarris") is the son of Manny Sarris.  Anthony Sarris is a registered representative of Royal Alliance, and at all times relevant hereto, together with his father, Manny Sarris, operated a branch office of RAA located at 54 Friends Lane, Newtown, Pennsylvania 18940, under the name "First Financial Resources, Inc." and "Sarris/First Financial Resources."  Anthony Sarris has also been the subject of certain regulatory proceedings resulting in the revocation and suspension of his state insurance registrations.

7.      As more fully set forth herein, Manny Sarris and Anthony Sarris (the "Individual Respondents") participated in the solicitation and sale of unregistered securities, in the form of an international currency hedge fund, the "Draseena Funds," to public customers, including Claimant from which the Individual Respondents and their related entities earned substantial undisclosed compensation.[3]

---

[3]      Anthony Sarris is listed as part of an "Professional Alliance" for the Draseena Funds Group (Exhibit "C").  Emanuel Sarris also purportedly served on the Draseena Funds Group on the Advisory Board, prior to the indictment and arrest of Draseena Funds Group manager, Daniel Spitzer.

8.      Respondent Royal Alliance is responsible for the supervision of Sarris' activities, their communications to the investing public, and the activities conducted at the Sarris' "independent" branch office to reasonably detect and prevent the misconduct complained of herein (and the sale of unregistered securities to public customers).   Royal Alliance also had the opportunity and ability to control the activities conducted at its branch offices, by the Individual Respondents,  and is therefore liable to Claimant under common law agency principles, and as a "control person" pursuant to Section 20(a) of the Exchange Act of 1934, 15 U.S.C. §78(*t*)[4] and Chapter 6, Section 7323 (b) of the Delaware Uniform Securities Act,  Chapter 6 Delaware Code §7323(b).

---

[4]        Section 20(a) of the Exchange Act of 1934, 15 U.S.C. 78*t*(a) provides that:

> every person who directly or indirectly controls and person liable under any provision of this chapter or any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the acts or acts constituting the violation or cause of action.

15 U.S.C. § 78*t*(a);  *See also, Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1573 (9th Cir. 1990)("Congress adopted Section 20(a) in an attempt to protect the investing public from representatives who were improperly supervised or controlled").  In order to establish liability under Section 20(a), a plaintiff need only allege that the controlling person had knowledge, or at least a duty to know, of the alleged wrongful activity, and the power or ability to control or influence the affairs of the controlled persons. *Arthur Children's Trust v. Keim*, 994 F.2d 1390, 1398 (9th Cir. 1993);  *Powers v. Eichen*,  977 F. Supp. 1031, 1044-45 (N.D. Cal. 1997) ("plaintiff need not show day-to-day control of affairs, only that defendants had possession of the power to influence in order to state a claim under Section 20(a)"). *Hollinger,*  914 F.2d at 1572 n.16  (same);  *Safeway Portland Employees' Fed. Credit Union v. C.H. Wagner & Co.*, 501 F.2d 1120 (9th Cir. 1974) (same);  *See also., Platsis v. E.F. Hutton & Co., Inc.*, 642 F. Supp. 1277 (W.D. Mich. 1986) (liability will attach under Section 20(a) where control person exercises control in the activities or operations of the control person);  *Bull v. Chandler*, 1987 Transfer Binder, Fed. Sec. L. Rep. ¶ 93,257 (CCH) (N.D. Cal. 1987) (participation of control person in activities of controlled person sufficient to confer liability).

4

### III.   FACTUAL ALLEGATIONS

9.     Jacqueline E. Eisenberg is 63 year-old retired widow.  Prior to her retirement, she was a school teacher.  Presently, she is substantially disabled, and suffers from, among other things, Graves Disease.

10.    Manny Sarris purports to be in "the top one-tenth of one percentile of financial services professionals in the USA."   He claims more than 35 years of investment experience, and the financial advisor to many customers "of significant wealth"  throughout the United States and Europe.   Although Manny Sarris' complete educational background is unclear, he also claims to have taught courses at the Wharton School of Business of the University of Pennsylvania.

11.    Manny Sarris and Anthony Sarris are also self proclaimed experts on "advanced estate planning," and are also authors of a book:  *Exit Smiling . . . and Pay No Estate Taxes Into the Next Millennium*."  (Publisher Unknown).

12.    Prior to her husband's death in March 2008, Claimant and her husband, (a former Dupont employee) were solicited by Manny Sarris and Anthony Sarris to attend an investment seminar in Wilmington, Delaware.  Thereafter, Claimant (and her deceased husband) were solicited to purchase, and did purchase, certain life insurance from Manny Sarris and Anthony Sarris.

13.    Claimant was also directed by Manny Sarris and Anthony Sarris to an estate planning lawyer, for the purpose of effecting certain trusts to protect Claimant's assets (and those of her chronically ill husband) from potential creditors.

14.    Thereafter, following the death of Claimant's husband, Claimant was solicited by Manny Sarris and Anthony Sarris to invest the proceeds of Claimant's husband's life insurance

5

and retirement savings into the Draseena Funds Group.

15.     According to Manny Sarris and Anthony Sarris, investments in the stock market or in banks were not safe, that future of the United States dollar was uncertain, and that the only safe investment was in international currencies, which according to marketing materials provided to Claimant provided  stability "independent of the volatility of stocks and bonds."

16.     Manny Sarris and Anthony Sarris also told Claimant that they had conducted substantial due diligence with respect to the Draseena Funds Group, that they had invested several million dollars of their own money in the Draseena Funds Group, which over the years had been highly profitable.

17.      According to Respondents, these funds, (which could be redeemed at any time), were invested in various global currencies using the "Kenzie Methodology," which was a complete "hedge" or riskless investment strategy that had never lost money and were consistently returning in excess of 13% per year on average since inception.  (Exhibit "D").

18.     Based upon these representations, in September 2008 and October 2008, Claimant invested $1,656,128 in the Draseena Conservium Fund, L.L.C., and in October 2008, invested $2,218,000 in the Three Oaks Senior Strength Fund L.L.C.

19.     When Claimant expressed her concerns about invested substantially her entire life savings with the Draseena Funds Group, Respondents also told Claimant that each account with the Draseena Funds Group was insured by Lloyds of London for up to $5 million.

20.     Unbeknownst to Claimant, the Draseena Conservium Fund, L.L.C., the Three Oaks Senior Strength Fund,  and all the Draseena related funds, were "Ponzi" schemes.   On June 17, 2010, the United States Securities & Exchange Commission filed a civil injunctive complaint

against Draseena and its related individuals for fraud and the violation of the federal securities laws. According to the SEC Action, Draseena was a fraudulent scheme, in which more than $105 million was taken from approximately 400 investors, but only $30 million of which was actually invested, with the converted funds used to pay existing investors, and provide the illusion of inflated returns. The SEC's complaint further alleges the company, and its related individuals used offshore bank accounts to pay purported business expenses of the companies, including more than $15 million in purported operating expenses and more than $4.8 million in third-party business expenses, including more than $900,000 spent at a Las Vegas casino.   (*See*, *SEC v. Daniel Spitzer, et al.*, Civil Action No. 1:10-cv-03758 (N.D. Ill.) (Leinenweber, J.)(Exhibit "E").

21.     On August 2, 2010, the United States Attorney's Office for the Northern District of Illinois also filed a criminal complaint in the United States Court for the Northern District of Illinois against Draseena Funds Group Chair, Daniel Spitzer for numerous counts of mail fraud and wire fraud, and that specifically, the Draseena Fund Group was an international Ponzi scheme. (*See, United States of America v. Spitzer*, Criminal Action 10-CR-651 (N.D. Ill.)(Aug. 2, 2010)(Exhibit "F").

22.     It was also discovered that Respondents and their related entities earned substantial undisclosed "commissions," and/or "kick-backs" from Draseena in connection with the sale of these securities to Claimant (and many others).

23.     As a direct and proximate result of Respondents' wrongful conduct, Claimant has suffered damages of $3,874,000, exclusive of foregone interest, costs and attorneys' fees.

**First Count**
**Violation of Sections 10(b) and 20(a)**
**of the Securities Exchange Act of 1934**

24.     Claimant incorporates the allegations set forth above in ¶¶ 1 through 23 inclusive, by reference.

25.     As set forth above, Respondents made misrepresentations and omissions of material facts in connection with the recommendation and sale of securities to Claimant.

26.     These misstatements and omissions of material fact, include:

a)     the failure to disclose that Respondents had not performed any meaningful due diligence with respect to the Draseena Conservium Fund, L.L.C. or the Three Oaks Senior Strength Fund, L.L.C., or its fund managers;

b)     the fund was not risk free, and  the reported investment returns were reasonably unattainable,  unsustainable, and fictitious on their face;

c)     the documents provided to Claimant did not show actual returns, but hypothetical historic returns which never occurred and were misleading to compare to index funds;

d)     Claimant's investment and the investment fund manager was not insured by Lloyds of London;

e)      Manny Sarris and Anthony Sarris were  substantially untrained, they lacked any special information or expertise, and their unsupervised activities were not supported by any research or other due diligence by Respondent Royal Alliance;

f)     the Individual Respondents and their related entities had an undisclosed financial interest in the sale of these securities to Claimant; and that

8

g)     Respondents' recommendation and purchase of these securities was not designed to further Claimant's investment objectives, but instead was designed to further the financial interests of Respondents.

27.    These misstatements and omissions of material fact made in connection with the sale of securities were effected with the intent of deceiving Claimant and constitute violations of § 10(b) of the Securities Act of 1934, and SEC Rule 10b-5, as promulgated thereunder.

28.    Respondents' conduct constitutes a deceptive and fraudulent practice in violation of FINRA Conduct Rule IM-2310, and is actionable under §10(b) of the Securities Exchange Act of 1934, and SEC Rule 10b-5 as promulgated thereunder.

29.    Claimant alleges that Respondents Royal Alliance, First Financial Resources, and Sarris Financial Group, Inc. are responsible for the conduct of Manny Sarris and Anthony Sarris, under the common law agency principles, the doctrine of respondeat superior, and as control persons pursuant to Section 20(a) of the Exchange Act of 1934, 15 U.S.C. § 78t.[5]

---

[5]     *See, e.g. , LustgRoyal Alliancef v. Behrens*, 619 F.3d 867 (8th Cir. 2010)(plaintiffs stated a claim for control person liability against a broker-dealer whose registered representative conducted a Ponzi scheme, even though the fraud was conducted through a third-party brokerage firm); *Harrison v. Dean Witter Reynolds, Inc.*, 79 F.3d 609 (7th Cir. 1996), *cert. denied*, 519 U.S. 825 (1996)(broker-dealer liable for Ponzi scheme run by two registered representatives in Dean Witter's Boca Raton branch office, despite that customers did not deal directly with Dean Witter in purchasing them); *Jairett v. First Montauk Securities Corp.*, 153 F.Supp. 2d 562 (E.D. Pa. 2001)(broker-dealer "control person" liable for registered representative's sales of mortgage interests through a wholly separate entity); *Hunt v. Miller*, 908 F.2d 1210 (4th Cir. 1990)(broker dealer responsible for registered representative's sale of limited partnership interests sold away from firm); *Martin v. Shearson Lehman Hutton, Inc.*, 986 F.2d 242 (8th Cir. 1993), *cert. denied*, 114 S.Ct. 177 (1993)(Shearson's status as employer [of the registered representative] is sufficient to establish it as a controlling person);   *See also, In re Royal Alliance Assoc.*, Exchange Act Rel. No. 38174, 1997 SEC Lexis 113 (Jan. 15, 1997) (disciplining firm that failed to stop two branch managers from selling Ponzi schemes); *In re Kolar*, Exchange Act Rel. No. 46127, 2002 SEC Lexis 1647 (June 26, 2002) (suspending Dean Witter supervisor who failed to detect and prevent broker's sales of investments, promoted as collateral-backed promissory notes);   *In re Kunz*, Exchange Act Rel. No.

WHEREFORE, Claimant requests that an award be entered against Respondents, jointly and severally, for:

a)      rescission;

b)      compensatory damages of  $3,874,000;

c)      lost income under the "well managed portfolio" theory of recovery;

d)      punitive damages in accordance with Rule 10330(e);

e)      interest at the legal rate;

f)      reasonable attorneys fees and cost of suit; and

g)      any other relief that is just, fair and equitable.

### Second Count
### Violation of Section 12 Of The Securities Act of 1933

30.      Claimant incorporates the allegations set forth above in ¶¶ 1 through 29 inclusive, by reference.

31.      Claimant brings this claim under Section 12(1) of the Securities Act of 1933, 15 U.S.C. § 77*l*(a)(1), resulting from the sale of unregistered securities, and under Section 12(2) of the Securities Act of 1933, 15 U.S.C. 77*l*(a)(2), resulting from the sale of securities by means of a materially false or misleading writings, and omissions of material fact in connection with the sale of the Draseena Conservium Fund, L.L.C. and the Three Oaks Senior Strength Fund, L.L.C.

---

45290, 2002 SEC Lexis 104 (Jan. 16, 2002) (disciplining broker-dealer that failed to prevent broker's sales of "Wholesale Mortgage Loan Participation Interests");  *In re Consolidated Investment Serv.*, Exchange Act Rel. No. 36687, 1996 SEC Lexis 83; 52 S.E.C. 582 (Jan. 5, 1996) (suspending firm for failing to detect and prevent broker's sales of $5 million of non-existent "Agency CD Notes"); *In re Stuart, Coleman & Co.*, Exchange Act Rel. No. 38001, 1996 SEC Lexis 3266 (Dec. 2, 1996) (disciplining firm where branch manager had permitted registered representatives to sell fraudulent limited partnership interests, even though firm had explicitly refused written request for permission).

32.     Section 12 of the Securities Act of 1933, provides that any person who (1) offers or sells an unregistered security in violation of Section 77e, or (2) offers or sells a security by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading, shall be liable to the person purchasing such security from him for the consideration paid for such security, less the amount of any income received thereon.

33.     As set forth above, Respondents sold Claimant unregistered securities through the use of the means and  instrumentalities of communication in interstate commerce, by means of false statements and a series of false oral communications as set forth above.

34.     As a direct and proximate result, Claimant has been damaged.

WHEREFORE, Claimant requests that an award be entered against Respondents, jointly and severally, for:

a)      rescission; or

b)      compensatory damages of $3,874,000;

c)      interest at the legal rate;

c)      punitive damages;

d)      reasonable attorneys fees and cost of suit; and

e)      any other relief that is just, fair and equitable.

**Third Count**
**Violation of The Delaware Uniform Securities Act**

35.     Claimant incorporates the allegations set forth above in ¶¶ 1 through 343 inclusive, by reference.

36.     Section 7304 of the Delaware Uniform Securities Act, Chapter 6 Delaware Code § 7304, declares it unlawful to engage in the sale of securities that are not registered, or exempt from registration under the Delaware Uniform Securities Act.

37.     Section 7313 of the Delaware Uniform Securities Act, Chapter 6 Delaware Code § 7313, declares it unlawful for any person to transact business in Delaware as a broker-dealer or agent unless the person is registered under this chapter.

38.     As set forth above, the securities sold to Claimant were not registered or exempt from registration pursuant to Section 7304 of the Delaware Uniform Securities, or were the Individual Respondents registered as agents as otherwise required pursuant to Section 7313 of the Delaware Uniform Securities Act.

39.     In addition, Section 7303 of the Delaware Uniform Securities Act declares it unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly:

> (1) To employ any device, scheme or artifice to defraud;
>
> (2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or
>
> (3) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person.

Section 7303 of the Delaware Uniform Securities Act, Chapter 6 Delaware Code § 7303.

40.     As set forth above, Claimant was sold securities by means of untrue statements and omissions of material facts.  Claimant reasonably and justifiably relied on these misstatements and omissions of material fact, and through the exercise of reasonable care could not have ascertained the truth regarding these misstatements and omissions of material fact.

41.     These misrepresentations and omissions of material fact touch upon, and are the direct and proximate cause of Claimant's losses.

42.     Respondent Royal Alliance is responsible for the conduct of the Individual Respondents as a "control person" pursuant to Chapter 6, Section 7323 (b) of the Delaware Uniform Securities Act,  Chapter 6 Delaware Code §7323(b).

WHEREFORE, Claimant requests that an award be entered against Respondents, jointly and severally, for:

a)     rescission; or

b)     compensatory damages of $3,874,000;

c)     interest at the legal rate pursuant to Chapter 6, Section 7323 (a) of the Delaware Uniform Securities Act;

c)     punitive damages;

d)     reasonable attorneys fees and cost of suit pursuant to Chapter 6, Section 7323 (a) of the Delaware Uniform Securities Act; and

e)     any other relief that is just, fair and equitable.

**Fifth Count**
**Breach of Fiduciary Duty**

43.     Claimant incorporates the allegations set forth above in ¶¶ 1 through 42, inclusive, by reference.

44.     Respondents held themselves out as having that knowledge, skill and expertise to render investment advice reasonably calculated to fulfill the investment objectives of their customers.

45.     Respondent Royal Alliance also has a duty to supervise the sales practices of its registered representatives, and the activities conducted at its branch locations, to prevent the sale of unregistered securities to generate commissions and fees.

WHEREFORE, Claimant requests that an award be entered against Respondents, jointly and severally, for:

a)     rescission;

b)     compensatory damages of $3,874,000;

c)     lost income under the "well managed portfolio" theory of recovery;

d)     punitive damages;

e)     interest at the legal rate;

f)     reasonable attorneys fees and cost of suit; and

g)     any other relief that is just, fair and equitable.

**Sixth Count**
**Failure to Supervise**

46.     Claimant incorporates the allegations set forth above in ¶¶ 1 through 45, inclusive, by reference.

47.     Claimant asserts that Respondent Royal Alliance has an affirmative duty to supervise the activities of its "independent" registered representatives, including Anthony Sarris, to monitor their communications with the investing public, and to periodically audit and inspect its

14

"branch office" to reasonably prevent, undisclosed or unauthorized outside business activities and

the sale of unregistered securities by associated and unassociated persons on the premises.

     48.     FINRA Conduct Rule 3010, specifically provides that:

> Each member shall establish and maintain a system to supervise the activities of each registered representative and associated person that is reasonably designed to achieve compliance with applicable securities laws and regulations, and with the Rules of this Association. Final responsibility for proper supervision shall rest with the member.

     49.     Claimant alleges that had such a periodic inspection occurred, it would have

been reasonably apparent that Anthony Sarris was participating in the sale of unregistered securities,

and that Manny Sarris, an unregistered (and otherwise barred) individual, was holding himself out

as being associated with Royal Alliance, had an undisclosed financial interest in the branch, and was

engaging in false and deceptive sales practices in connection with the sale of unregistered securities

to the investing public.

     50.     With respect to the supervision of the sale of private placements, FINRA has

reminded its members that "[a]firm that engages in Regulation D offerings must have supervisory

procedures under Rule 3010 that are reasonably designed to ensure that the firm's personnel,

including its registered representatives:

> •     engage in an inquiry that is sufficiently rigorous to comply with their legal and regulatory requirements;

> •     perform the analysis required by NASD Rule 2310;

> •     qualify their customers as eligible to purchase securities offered pursuant to Regulation D; and

> •     do not violate the antifraud provisions of the federal securities laws or FINRA rules in connection with their preparation or

distribution of offering documents or sales literature.

FINRA Notice to Members 10-22 at 7 (April 2010).[6]

51.     Upon information and belief, Royal Alliance is also aware of its inability to supervise the sales practices at its franchise offices, where there is no on-site supervision, but believes that it is insulated, or indemnified, from all forms of liability, (even if it hires registered representatives with a significant regulatory history and/or history of customer complaints), because it requires these "independent" representatives, to obtain, and pay the costs of their own Errors and Omissions liability insurance.

52.     As a direct and proximate result of the intentional and negligent failure to supervise by Respondent Royal Alliance, Claimant has been damaged.

WHEREFORE, Claimant requests that an award be entered against Royal Alliance for:

a)     compensatory damages of  $3,874,000;

b)     lost income under the "well managed portfolio" theory of recovery;

c)     punitive damages;

d)     interest at the legal rate;

e)     reasonable attorneys fees and cost of suit; and

f)     any other relief that is just, fair and equitable.

---

[6]     FINRA Notice to Members 10-22 also provides that a broker dealer must conduct a reasonable investigation into each offering, must maintain supervisory procedures under Rule 3010 that are reasonably designed to ensure that these securities are suitable for particular customers, and retain records documenting both the process and results of its investigation.

**Seventh Count**
**Common Law Fraud**

53.     Claimant incorporate the allegations set forth above in ¶¶ 1 through 52 inclusive, by reference.

54.     Claimant asserts that Respondents made willful and intentional misstatements and omissions of material fact with the intent of deceiving Claimant.

55.     These misstatements and omissions of material fact include the failure to disclose that:

a)     Respondents had not performed any meaningful due diligence with respect to the Draseena Conservium Fund, L.L.C., the Three Oaks Senior Strength Fund,  or its fund managers;

b)     the fund was not risk free, and  the reported investment returns were reasonably unattainable,  unsustainable, and fictitious on their face;

c)     the documents provided to Claimant did not show actual returns, but hypothetical historic returns which never occurred and were misleading to compare to index funds;

d)     Claimant's investment and the investment fund manager was not insured by Lloyds of London;

e)      Manny Sarris and Anthony Sarris were  substantially untrained, they lacked any special information or expertise, and their unsupervised activities were not supported by any research or other due diligence by Respondent Royal Alliance;

f)     the Individual Respondents and their related entities had an undisclosed financial interest in the sale of these securities to Claimant; and that

17

g)      Respondents' recommendation and purchase of these securities was not designed to further Claimant's investment objectives, but instead was designed to further the financial interests of Respondents.

56.      Respondents' conduct, as set forth herein, is outrageous on its face, and warrants the imposition of punitive damages.

57.      As a direct result of Respondents' common law fraud and ongoing course of wrongful conduct, Claimant have been damaged.

WHEREFORE, Claimant requests that an award be entered jointly and severally against Respondents for:

a)      rescission;

b)      compensatory damages of  $3,874,000;

c)      lost income under the "well managed portfolio" theory of recovery;

d)      punitive damages;

e)      interest at the legal rate;

f)      reasonable attorneys fees and cost of suit; and

g)      any other relief that is just, fair and equitable.


Dated:  November 3, 2011                    By *Nicholas J. Guiliano*
                                            Nicholas J. Guiliano, Esquire
                                            The Guiliano Law Firm, P.C.
                                            230 South Broad Street, Suite 6010
                                            Philadelphia, PA 19102
                                            Telephone (215) 413-8223
                                            Telecopier (215) 413-8225
                                            nick@nicholasguiliano.com

                                            Attorneys for Claimant

# Exhibit A

Sarris First Financial Resources Manny Sarris & Tony Sarris                    Page 1 of 1



ESTATE PLANNING STRATEGY    ABOUT US    UPCOMING EVENTS    TESTAMONIALS    RESOURCES    CONTACT

# Sarris | First Financial Resources

## THE POWER OF CHOICE

Perhaps the ultimate benefit of working with the Principals of First Financial Resources lies in the multitude of choices available to provide customized solutions to your needs. FFR Principals provide one source—available to both individuals and companies—for help in the enhancement, preservation and transfer of assets; cost saving benefit programs; executive compensation programs and concepts; bank owned life insurance; estate planning; business continuity; training; insurance; charitable giving and more.

**Manny Sarris**

Manny is a licensed registered representative with Royal Alliance Associates, member of the NASD and SIPC...

**Tony Sarris**

Tony (Anthony) is a licensed registered representative with Royal Alliance Associates, member of the NASD and SIPC...

Perhaps the ultimate benefit of working with the Principals of First Financial Resources lies in the multitude of choices available to provide customized solutions to your needs.



Get the book Today!

LEARN MORE

**Check Back for Upcoming Events**

COPYRIGHT ©2011 First Financial Resources. All Rights Reserved.

Sarris First Financial Resources Mission & Vision Statement



ESTATE PLANNING STRATEGY    ABOUT US    UPCOMING EVENTS    TESTAMONIALS    RESOURCES    CONTACT

# Sarris | First Financial Resources

**ABOUT US**

About FFR
Mission / Vision
Manny Sarris
Tony Sarris
Exit Smiling
Community
FFR Network
Contact Us

## Our Mission & Vision

Our mission is to assist our high-net-worth clients in meeting their long-term goals and objectives while providing them with the tools and knowledge they require to meet these goals.

We believe in strong family values and the desire to maintain family wealth in the family bloodline. Estate planning is not just about saving the assets from mass taxation; it's about protecting the family from outside predators (i.e., creditors, lawsuits, divorces, etc.).

A well-developed estate plan must not impinge upon the creator's current lifestyle. Any solution to a client's problem must be recommended on the basis that it improves the family's well being without change or sacrifice to the client's lifestyle.
We must be objective in our analysis and recommendations since no two family estates are alike.



Perhaps the ultimate benefit of working with the Principals of First Financial Resources lies in the multitude of choices available to provide customized solutions to your needs.

Get the book Today!

LEARN MORE

**Check Back for Upcoming Events**

COPYRIGHT ©2011 First Financial Resources. All Rights Reserved.

Manny Sarris First Financial Resources

ESTATE PLANNING STRATEGY     ABOUT US     UPCOMING EVENTS     TESTAMONIALS     RESOURCES     CONTACT



# Sarris | First Financial Resources

**ABOUT US**

About FFR

Mission / Vision

Manny Sarris

Tony Sarris

Exit Smiling

Community

FFR Network

Contact Us

## Manny Sarris
### Principal Emeritas

Manny is a founding principal in 1987 and former board member of First Financial Resources. He has been providing sound financial advice since 1963 throughout the USA and Europe. He works with families who have significant wealth to enhance, tax efficiently transferring their wealth to the next generation while protecting their wealth from unjust law suits. Besides providing planning ideas and solutions, he brings to the process the critical function of translating the strategy each discipline uses in the planning for his clients. He is best known for his uncanny ability to simplify even the most complex of financial concepts. Unlike many speakers, his presentations have both intellectual content and emotional impact. He has spoken extensively within the U.S. and abroad.

He is a member of the *Top of the Table*, and is among one of only 15 worldwide members who has been a member for the last 34 consecutive years. This organization recognizes him nationally as the standard of excellence in the financial services field. This places him in the top one-tenth of one percentile of financial services professionals, in the USA based on certain production requirements and ethical standards. He is a co-author, along with his son a book on advanced estate planning entitled *Exit Smiling . . . and Pay No Estate Taxes Into the Next Millennium*. He is in the final process of releasing his second book along with his son, Tony.

He has been a guest lecturer on the topic of advanced estate planning at the University of Pennsylvania Wharton School of Business, Temple University Law School and The American College. Manny is also a Charter Member of the National Association of Insurance and Financial Advisors and has received the "Man of the Year" award on eight different occasions. He is also listed in "Who's Who in Leading American Executives." He is a graduate of LaSalle University in Philadelphia with a Bachelor of Arts degree and did his master's degree work at Temple University.



Perhaps the ultimate benefit of working with the Principals of First Financial Resources lies in the multitude of choices available to provide customized solutions to your needs.

Get the book Today!

LEARN MORE

**Check Back for Upcoming Events**

COPYRIGHT ©2011 First Financial Resources. All Rights Reserved.

Sarris First Financial Resources Mission & Vision Statement

MBA in Fraud Examination - Online MBA in Fraud Examination ideal for working professionals.  From: Degree Tree

**MannySarris**

Principal at First Financial Resources

Greater Philadelphia Area | Financial Services

| | |
|---|---|
| Current | • **Principal at First Financial Resources** |
| Connections | 6 connections |
| Public Profile | http://www.linkedin.com/pub/manny-sarris/14/116/7a1 |

Share                                               Print

## Contact Settings

**Interested In**

- consulting offers
- job inquiries
- business deals
- getting back in touch

- new ventures
- expertise requests
- reference requests

**Send a message to Manny Sarris**

♦ Send InMail

LinkedIn Corporation © 2011

# Exhibit B

OMB APPROVAL

OMB Number:     3235-0049
Expires:     February 28, 2011
Estimated Average burden
Hours per response..........4.07

**FORM ADV**

**Uniform Application for Investment Adviser Registration**

**Part II - Page 1**

| Name of Investment Adviser: | Sarris Financial Group, Inc. | | | |
|---|---|---|---|---|

| Address: | (Number and Street) | (City) | (State) | (Zip Code) | Area Code: | Telephone Number: |
|---|---|---|---|---|---|---|
| 5710 Oak Crest Lane | | Dolyestown | PA | 18902 | | 215-794-7333 |

**This part of FORM ADV gives information about the investment adviser and its business for the use of clients. The information has not been approved or verified by any government authority.**

### Table of Contents

| Item Number | Item | Page |
|---|---|---|
| 1 | Advisory Services and Fees | 2 |
| 2 | Types of Clients | 2 |
| 3 | Types of Investments | 3 |
| 4 | Methods of Analysis, Sources of Information and Investment Strategies | 3 |
| 5 | Education and Business Standards | 4 |
| 6 | Education and Business Background | 4 |
| 7 | Other Business Activities | 4 |
| 8 | Other Financial Industry Activities or Affiliations | 4 |
| 9 | Participation or Interest in Client Transactions | 5 |
| 10 | Conditions for Managing Accounts | 5 |
| 11 | Review of Accounts | 5 |
| 12 | Investment or Brokerage Discretion | 6 |
| 13 | Additional Compensation | 6 |
| 14 | Balance Sheet | 6 |
| | Continuation Sheet | Schedule F |

(Schedule A, B, C, D, and E are included with Part I of this Form, for the use of regulatory bodies, and are not distributed to clients.)

Potential persons who are to respond to the collection of information contained in this form
are not required to respond unless the form displays a currently valid OMB control number.

| FORM ADV<br>Part II - Page 2 | Applicant: Sarris Financial Group, Inc. | SEC File Number:<br><br>801- | Date:<br><br>8/5/2009 |
|---|---|---|---|

**1.   A.   Advisory Services and Fees.** (check the applicable boxes)   For each type of service provided, state the approximate % of total advisory billings from that service. (See instruction below.)

Applicant:

- [ ] (1)  Provides investment supervisory services ................................................................ _____ %
- [ ] (2)  Manages investment advisory accounts not involving investment supervisory services.................... _____ %
- [ ] (3)  Furnishes investment advice through consultations not included in either service described above... _____ %
- [ ] (4)  Issues periodicals about securities by subscription .......................................................... _____ %
- [ ] (5)  Issues special reports about securities not included in any service described above.......................... _____ %
- [ ] (6)  Issues, not as part of any service described above, any charts, graphs, formulas, or other devices which clients may use to evaluate securities................................................................ _____ %
- [ ] (7)  On more than an occasional basis, furnishes advice to clients on matters not involving securities... _____ %
- [ ] (8)  Provides a timing service ................................................................................ _____ %
- [x] (9)  Furnishes advice about securities in any manner not described above.......................................... 100 %

(Percentages should be based on applicant's last fiscal year. If applicant has not completed its first fiscal year, provide estimates of advisory billings for that year and state that the percentages are estimates.)

**B.**  Does applicant call any of the services it checked above financial planning or some similar term? .......  Yes [ ]  No [x]

**C.**  Applicant offers investment advisory services for: (check all that apply)

- [ ] (1)  A percentage of assets under management
- [ ] (2)  Hourly charges
- [ ] (3)  Fixed fees (not including subscription fees)
- [ ] (4)  Subscription fees
- [ ] (5)  Commissions
- [x] (6)  Other

**D.**  For each checked box in A above, describe on Schedule F:

- the services provided, including the name of any publication or report issued by the adviser on a subscription basis or for a fee
- applicant's basic fee schedule, how fees are charged and whether its fees are negotiable
- when compensation is payable, and if compensation is payable before service is provided, how a client may get a refund or may terminate an investment advisory contract before its expiration date

**2.   Types of clients** - Applicant generally provides investment advice to: (check those that apply)

- [x] A.  Individuals
- [ ] B.  Banks or thrift institutions
- [ ] C.  Investment companies
- [ ] D.  Pension and profit sharing plans
- [ ] E.  Trusts, estates, or charitable organizations
- [ ] F.  Corporations or business entities other than those listed above
- [ ] G.  Other (describe on Schedule F)

**Answer all items. Complete amended pages in full, circle amended items and file with execution page (page 1)**

| FORM ADV<br>Part II - Page 3 | Applicant: Sarris Financial Group, Inc. | SEC File Number:<br>801- | Date:<br>8/5/2009 |
|---|---|---|---|

**3. Types of Investments.** Applicant offers advice on the following: (check those that apply)

- [ ] A. Equity securities
  - [ ] (1) exchange-listed securities
  - [ ] (2) securities traded over-the-counter
  - [ ] (3) Foreign issuers
- [ ] B. Warrants
- [ ] C. Corporate debt securities (other than commercial paper)
- [ ] D. Commercial paper
- [ ] E. Certificates of deposit
- [ ] F. Municipal securities
- G. Investment company securities:
  - [ ] (1) variable life insurance
  - [ ] (2) variable annuities
  - [ ] (3) mutual fund shares

- [ ] H. United States government securities
- I. Options contracts on:
  - [ ] (1) securities
  - [ ] (2) commodities
- J. Futures contracts on:
  - [ ] (1) tangibles
  - [ ] (2) intangibles
- K. Interests in partnerships investing in:
  - [ ] (1) real estate
  - [ ] (2) oil and gas interests
  - [ ] (3) other (explain on Schedule F)
- [x] L. Other  (explain on Schedule F)

**4. Methods of Analysis, Sources of Information, and Investment Strategies.**

A. Applicant's security analysis methods include: (check those that apply)

- (1) [ ] Charting
- (2) [ ] Fundamental
- (3) [ ] Technical
- (4) [ ] Cyclical
- (5) [x] Other  (explain on Schedule F)

B. The main sources of information applicant uses include: (check those that apply)

- (1) [x] Financial newspapers and magazines
- (2) [ ] Inspections of corporate activities
- (3) [ ] Research materials prepared by others
- (4) [ ] Corporate rating services
- (5) [ ] Timing services
- (6) [ ] Annual reports, prospectuses, filings with the Securities and Exchange Commission
- (7) [ ] Company press releases
- (8) [ ] Other  (explain on Schedule F)

C. The investment strategies used to implement any investment advice given to clients include: (check those that apply)

- (1) [ ] Long term purchases<br>(securities held at least a year)
- (2) [ ] Short term purchases<br>(securities sold within a year)
- (3) [ ] Trading (securities sold within 30 days)
- (4) [ ] Short sales
- (5) [ ] Margin transactions
- (6) [ ] Option writing, including covered options, uncovered options or spreading strategies
- (7) [x] Other (explain on Schedule F)

**Answer all items. Complete amended pages in full, circle amended items and file with execution page (page 1)**

| FORM ADV<br>Part II - Page 4 | Applicant: Sarris Financial Group, Inc. | SEC File Number:<br>801- | Date:<br>8/5/2009 |
|---|---|---|---|

**5.   Education and Business Standards.**

Are there any geueral standards of education or business experience that applicant requires of those involved in determining or giving investment advice to clients? ....................................................................................................

Yes ☐   No ☑

(If yes, please describe these standards on Schedule F)

**6.   Education and Business Background.**

For:
- each member of the investment committee or group that determines general investment advice to be given to clients, or
- if the applicant has no investment committee or group, each individual who determines general investment advice clients (if more than five, respond only for their supervisors)
- each principal executive officer of applicant or each person with similar status or performing similar functions.

On Schedule F, give the:
- name
- year of birth
- formal education after high school
- business background for the preceding five years

**7.   Other Business Activities.**   (check those that apply)

☐   A.   Applicant is actively engaged in a business other than giving investment advice.

☐   B.   Applicant sells products or services other than investment advice to clients.

☑   C.   The principal business of applicant or its principal executive officers involves something other than providing investment advice.

(For each checked box describe the other activities, including the time spent on them, on Schedule F.)

**8.   Other Financial Industry Activities or Affiliations.**   (check those that apply)

☐   A.   Applicant is registered (or has an application pending) as a securities broker-dealer.

☐   B.   Applicant is registered (or has an application pending) as a futures commission merchant, commodity pool operator or commodity trading adviser.

☐   C.   Applicant has arrangements that are material to its advisory business or its clients with a related person who is a:

☐   (1)   broker-dealer

☐   (2)   investment company

☐   (3)   other investment adviser

☐   (4)   financial planning firm

☐   (5)   commodity pool operator, commodity trading adviser or futures commission merchant

☐   (6)   banking or thrift institution

☐   (7)   accounting firm

☐   (8)   law firm

☐   (9)   insurance company or agency

☐   (10)   pension consultant

☐   (11)   real estate broker or dealer

☐   (12)   entity that creates or packages limited partnerships

(For each checked box in C, on Schedule F identify the related person and describe the relationship and the arrangements.)

Yes   No

D.   Is applicant or a related person a general partner in any partnership in which clients are solicited to invest?..   ☐   ☑

(If yes, describe on Schedule F the partnerships and what they invest in.)

**Answer all items. Complete amended pages in full, circle amended items and file with execution page (page 1)**

| FORM ADV<br>Part II - Page 5 | Applicant: Sarris Financial Group, Inc. | SEC File Number:<br>801- | Date:<br>8/5/2009 |
| --- | --- | --- | --- |

**9.  Participation or Interest in Client Transactions.**

Applicant or a related person: (check those that apply)

☐  A.  As principal, buys securities for itself from or sells securities it owns to any client.

☐  B.  As broker or agent effects securities transactions for compensation for any client.

☐  C.  As broker or agent for any person other than a client effects transactions in which client securities are sold to or bought from a brokerage customer.

☐  D.  Recommends to clients that they buy or sell securities or investment products in which the applicant or a related person has some financial interest.

☐  E.  Buys or sell for itself securities it also recommended to clients.

(For each box checked, describe on Schedule F when the applicant or a related person engages in these transactions and what restrictions, internal procedures, or disclosures are used for conflicts of interest in those transactions.)

Describe, on Schedule F, your code of ethics, and state that you will provide a copy of your code of ethics to any client or prospective client upon request.

---

**10.  Conditions for Managing Accounts.**  Does the applicant provide investment advisory services, manage investment advisory accounts or hold itself out as providing financial planning or some similarly termed services *and* impose a minimum dollar value of assets or other condition for starting or maintaining an account?

Yes ☐   No ☑

(If yes, describe on Schedule F)

---

**11.  Review of Accounts.**  If applicant provides investment supervisory services, manages investment advisory account, or holds itself out as providing financial planning or some similarly termed services:

A.  Describe below the reviews and reviewers of the accounts. **For reviews,** include their frequency, different levels, and triggering factors. **For reviewers,** include the number of reviewers, their titles and functions, instructions they receive from applicant on performing reviews, and number of accounts assigned each.

B.  Describe below the nature and frequency of regular reports to clients on their accounts.

---

Answer all items. Complete amended pages in full, circle amended items and file with execution page (page 1)

| FORM ADV<br>Part II - Page 6 | Applicant: Sarris Financial Group, Inc. | SEC File Number:<br>801- | Date:<br>8/5/2009 |
|---|---|---|---|

**12.    Investment or Brokerage Discretion.**

A.    Does applicant or any related person have authority to determine, without obtaining specific client consent, the:

                                                                               Yes  No

    (1)    securities to be bought or sold? ....................................................................................  ☐  ☑

                                                                               Yes  No

    (2)    amount of securities to be bought or sold? ..................................................................  ☐  ☑

                                                                               Yes  No

    (3)    broker or dealer to be used?    ....................................................................................  ☐  ☑

                                                                               Yes  No

    (4)    commission rates paid? ...............................................................................................  ☐  ☑

B.    Does applicant or a related person suggest brokers to clients? ...............................................  ☐  ☑
                                                                Yes  No

For each yes answer to A describe on Schedule F any limitations on the authority. For each yes to A(3), A(4) or B, describe on Schedule F the factors considered in selecting brokers and determining the reasonableness of their commissions. If the value of products, research and services given to the applicant or a related person is a factor, describe:

- the products, research and services

- whether clients may pay commissions higher than those obtainable from other brokers in return for those products and services

- whether research is used to service all of applicant's accounts or just those accounts paying for it; and

- any procedures the applicant used during the last fiscal year to direct client transactions to a particular broker in return for product and research services received.

**13.    Additional Compensation.**

Does the applicant or a related person have any arrangements, oral or in writing, where it:

A.    is paid cash by or receives some economic benefit (including commissions, equipment or non-research
      services) from a non-client in connection with giving advice to clients? ........................    ☐  ☑    Yes  No

B.    directly or indirectly compensates any person for client referrals?. ..............................    ☐  ☑    Yes  No

(For each yes, describe the arrangements on Schedule F.)

**14.    Balance Sheet.**  Applicant must provide a balance sheet for the most recent fiscal year on Schedule G if applicant:

- has custody of client funds or securities (unless applicant is registered or registering only with the Securities and Exchange Commission); or

- requires prepayment of more than $500 in fees per client and 6 or more months in advance

                                                                                 Yes  No

Has applicant provided a Schedule G balance sheet? .........................................................    ☐  ☑

**Answer all items. Complete amended pages in full, circle amended items and file with execution page (page 1)**

| Schedule F of<br>FORM ADV<br>Continuation Sheet for Form ADV Part II | Applicant:<br>Sarris Financial Group, Inc. | SEC File Number:<br><br>801- | Date:<br><br>8/5/2009 |
| --- | --- | --- | --- |

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other Schedules)

| 1. Full name of applicant exactly as stated in Item 1A of Part I of Form ADV:<br>Sarris Financial Group, Inc. | IRS Empl. Ident. No.:<br>23-228-1325 |
| --- | --- |

| Item of Form<br>(identify) | Answer |
| --- | --- |
| 7C. | Receives occasional calls from past clients and refers them to their own brokers and provides general / non-specific advice |

(Complete amended pages in full, circle amended items and file with execution page (page 1).

| Schedule F of<br>**FORM ADV**<br>**Continuation Sheet for Form ADV Part II** | Applicant:<br>Sarris Financial Group, Inc. | SEC File Number:<br>801- | Date:<br><br>8/5/2009 |
|---|---|---|---|

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other Schedules)

| 1. Full name of applicant exactly as stated in Item 1A of Part I of Form ADV:<br>**Sarris Financial Group, Inc.** | IRS Empl. Ident. No.:<br>**23-228-1325** |
|---|---|

| Item of Form<br>(identify) | Answer |
|---|---|
| | |

(**Complete amended pages in full, circle amended items and file with execution page (page 1).**)

| Schedule F of<br>**FORM ADV**<br>**Continuation Sheet for Form ADV Part II** | Applicant:<br>Sarris Financial Group, Inc. | SEC File Number:<br><br>801- | Date:<br><br>8/5/2009 |
|---|---|---|---|

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other Schedules)

| 1. Full name of applicant exactly as stated in Item 1A of Part I of Form ADV:<br>Sarris Financial Group, Inc. | IRS Empl. Ident. No.:<br>23-228-1325 |
|---|---|

| Item of Form<br>(identify) | Answer |
|---|---|
| | |

(Complete amended pages in full, circle amended items and file with execution page (page 1).)

| Schedule F of<br>FORM ADV<br>Continuation Sheet for Form ADV Part II | Applicant:<br>Sarris Financial Group, Inc. | SEC File Number:<br><br>801- | Date:<br><br>8/5/2009 |
|---|---|---|---|

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other Schedules)

| 1. Full name of applicant exactly as stated in Item 1A of Part I of Form ADV:<br>Sarris Financial Group, Inc. | IRS Empl. Ident. No.:<br>23-228-1325 |
|---|---|

| Item of Form<br>(identify) | Answer |
|---|---|
| | |

(Complete amended pages in full, circle amended items and file with execution page (page 1).)

| Schedule F of<br>**FORM ADV**<br>**Continuation Sheet for Form ADV Part II** | Applicant:<br>Sarris Financial Group, Inc. | SEC File Number:<br>801- | Date:<br>8/5/2009 |
|---|---|---|---|

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other Schedules)

| 1. Full name of applicant exactly as stated in Item 1A of Part I of Form ADV:<br>Sarris Financial Group, Inc. | IRS Empl. Ident. No.:<br>23-228-1325 |
|---|---|

| Item of Form<br>(identify) | Answer |
|---|---|
| | |

(Complete amended pages in full, circle amended items and file with execution page (page 1).

Exhibit C



Kenzie Traditional / DJIA Performance Comparison – 1981-2008

Yearly Cumulative Return

DJIA        Kenzie Traditional

Entire contents, may not be reproduced in whole or in any part without written permission. This is not an offer to buy or sell nor a solicitation of an offer to buy or sell any service, product, security or investment of any kind. Performance returns for Kenzie Traditional are compounded composites of multiple funds and methodologies, and are net of all fees and expenses. Past performance, activities, history, hypotheticals or estimates do not guarantee, warrant or suggest future performance, activities or results. Returns may include some partial fund estimates where actuals are not yet available.



Kenzie Traditional / DJIA Performance Comparison – 1990-2008

Entire contents, may not be reproduced in whole or in any part without written permission. This is not an offer to buy or sell nor a solicitation of an offer to buy or sell any service, product, security or investment of any kind. Performance returns for Kenzie Traditional are compounded composites of multiple funds and methodologies, and are net of all fees and expenses. Past performance, activities, history, hypotheticals or estimates do not guarantee, warrant or suggest future performance, activities and or results. Returns may include some partial fund estimates where actuals are not yet available.



# Kenzie Traditional / DJIA Performance Comparison – 2000-2008

Entire contents, may not be reproduced in whole or in any part without written permission. This is not an offer to buy or sell nor a solicitation of an offer to buy or sell any service, product, security or investment of any kind. Performance returns for Kenzie Traditional are compounded composites of multiple funds and methodologies, and are net of all fees and expenses. Past performance, activities, history, hypotheticals or estimates do not guarantee, warrant or suggest future performance, activities or results. Returns may include some partial fund estimates where actuals are not yet available.

# Exhibit D

### UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**RECEIVED**

JUN 1 7 2010

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

JUDGE LEINENWEBER

**MAGISTRATE JUDGE DENLOW**

|  |  |
|---|---|
| UNITED STATES SECURITIES<br>AND EXCHANGE COMMISSION, | : |
| Plaintiff, | : |
| v. | : |
| DANIEL SPITZER,<br>DRASEENA FUNDS GROUP, CORP.,<br>KENZIE FINANCIAL MANAGEMENT, INC.,<br>KENZIE SERVICES LLC,<br>ANEESARD MANAGEMENT LLC,<br>NERIUM MANAGEMENT CO.,<br>DN MANAGEMENT CO. LLC,<br>ARROW FUND, LLC,<br>ARROW FUND II, LLC,<br>CONSERVIUM FUND, LLC,<br>NERIUM CURRENCY FUND, LP,<br>SENIOR STRENGTH Q FUND, LLC,<br>SSECURITY FUND, LLC,<br>THREE OAKS ADVANCED FUND, LLC,<br>THREE OAKS CURRENCY FUND, LP,<br>THREE OAKS FUND, LP,<br>THREE OAKS FUND 25, LLC,<br>THREE OAKS SENIOR STRENGTH FUND,<br>LLC,<br>USFIRST FUND, LLC, | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |
| Defendants. | : |

CIVIL ACTION
FILE NO.
10C 3756

## FILED UNDER SEAL

## COMPLAINT

Plaintiff United States Securities and Exchange Commission ("Commission")

alleges as follows:

## NATURE OF THE ACTION

1.      The Commission brings this emergency law enforcement action to halt a $105 million fraudulent Ponzi scheme being perpetrated by Daniel Spitzer ("Spitzer") and the Defendant entities that he controls and to freeze any remaining assets of the Defendants to prevent any further dissipation of those assets, amongst other relief.

2.      From at least 2004 to the present, Spitzer, personally and through the Defendant entities, which he controls, has been running a fraudulent scheme in which he has raised $105,875,029 and has approximately 400 investors. Spitzer, individually and through the Defendant entities and various sales agents, represented to these investors that their money would be invested in investment funds that, in turn, would be invested primarily in foreign currency trading. They all further represented to investors that Spitzer's investment funds had not lost money and had profitable historical returns, including one year with an annual return of 184.15%.

3.      In reality, Spitzer used $71,886,926 of the investor proceeds to make Ponzi payments to other investors to keep his scheme afloat. As part of his scheme, Spitzer regularly collectively transferred and commingled investor funds in an elaborate web of domestic and offshore entity accounts. Since 2004, Spitzer did use approximately $13.5 million of the investor proceeds to invest through an offshore entity via a bank account in the Netherlands Antilles, however, these investments lost money and were subsequently liquidated. He used another $16 million to invest in money market funds that earned several thousand dollars, but Spitzer liquidated these investments as well. After all of these investments were liquidated, the vast majority of the money was

2

returned to Spitzer and he used these funds as part of the $71,886,926 that he paid back to investors.

4.    Spitzer also used offshore bank accounts to pay the purported business expenses of the Defendant entities. Using bank accounts at the National Bank of Anguilla and the First Bank of Puerto Rico, Spitzer used investor proceeds to pay $15,208,038 in purported operating expenses, including making payments to himself and various sales agents. Lastly, Spitzer used $4,819,024 to pay third party business expenses.

5.    To cover up his scheme and in furtherance of it, Spitzer issued to his investors false periodic statements and false Schedule K-1s, which provided investors with inflated returns leading them to believe that their investments with Spitzer were profitable. However, in light of the Ponzi payments, investment losses, and payments for purported expenses, these statements were all false and misleading because Spitzer's touted returns were unattainable.

6.    Spitzer's perpetuation of this scheme gave him access to tens of millions of dollars in investor proceeds and allowed him to hold himself out for years as a wealthy fund manager. As evidence of his extravagant lifestyle, between March 2006 and October 2009, Spitzer spent over $900,000 in cash at the Wynn Las Vegas Casino.

7.    Spitzer's scheme is on the verge of collapse. Since at least August 2009 and continuing through to the present, Spitzer has attempted to delay and avoided paying requested investor redemptions.

8.    Spitzer is desperate for money and has continued to prey on victims. Specifically, in March 2010, Spitzer obtained $100,000 from an investor for a purported

3

investment in one of Spitzer's more conservative investment funds.  Rather than invest in said fund, in April 2010, Spitzer used this investor's money to make $9,492 in Ponzi payments to four other investors, transferred $27,102 to the First Bank of Puerto Rico, and paid $26,257 for third party expenses.

9.     The Commission brings this action to end Spitzer's scheme.  The Defendants have engaged in and, unless enjoined, will continue to engage in transactions, acts, practices and courses of business which violate Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77(q)(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5 ] promulgated thereunder.  Defendants Spitzer, Kenzie Financial Management, Inc. and Kenzie Services LLC have engaged in and, unless enjoined, will continue to engage in transactions, acts, practices and courses of business which also violate Sections 206(1), 206(2), and 206(4) of the Investment Advisers Act of 1940 (the "Advisers Act") [15 U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(4)] and Rule 206-4(8) [17 C.F.R. § 275.206-4(8)] thereunder.

## JURISDICTION AND VENUE

10.     The Commission brings this action pursuant to Section 20(b) of the Securities Act [15 U.S.C. §77t(b)], Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)], and Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)].

11.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14], and 28 U.S.C. § 1331.

12.     Venue is proper in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa].

13.     Acts, practices and courses of business constituting violations alleged herein have occurred within the jurisdiction of the United States District Court for the Northern District of Illinois and elsewhere. Spitzer, individually and through certain Defendant entities, solicited investors in the Northern District of Illinois and two of the Defendant entities are Illinois corporations.

14.     The Defendants, directly and indirectly, made use of the means and instrumentalities of interstate commerce and of the mails in connection with the acts, practices, and courses of business alleged herein.

15.     The Defendants will, unless enjoined, continue to engage in the acts, practices and courses of business set forth in this complaint, and acts, practices and courses of business of similar purport and object.

## FACTS

### Defendants

16.     Daniel Spitzer is 51 years old and he is a United States citizen who resides in a U.S. territory, the U.S. Virgin Islands. Spitzer controls all of the Defendant entities. Spitzer compensated himself for purportedly providing investment advice to his investors. On March 28, 2001, the Commission instituted settled cease-and-desist proceedings against Spitzer for violations of Section 5 of the Securities Act.

17.     Kenzie Financial Management, Inc. ("Kenzie Financial"), is a U.S. Virgin Islands corporation, with offices in St. Thomas, U.S. Virgin Islands. Spitzer is the sole shareholder and principal of Kenzie Financial. Kenzie Financial purports to be an

5

asset management company specializing in foreign currencies.  It purportedly acted as the trading manager for eleven of the twelve investment funds that Spitzer also controls.  Kenzie Financial was purportedly paid for providing investment advice, based on the value of the assets under management and realized profits.

18.   **Kenzie Services LLC ("Kenzie Services")**, is a West Indies limited liability company with a business address in Charlestown, Nevis, West Indies.  Spitzer is the sole manager and member of Kenzie Services.  Kenzie Services purports to be an asset management company specializing in foreign currencies.  Kenzie Services is purportedly the investment manager for Spitzer's SSecurity Fund, LLC, an investment fund that Spitzer also controls.  Kenzie Services was purportedly paid for providing investment advice, based on the value of the assets under management and realized profits.

19.   **Draseena Funds Group, Corp. ("Draseena")** is an Illinois corporation with offices in Clearwater, Florida and an additional address in Stateline, Nevada.  Spitzer is the principal and controlling owner of Draseena.  Draseena claims to act as the administrative manager or general partner of six of Spitzer's investment funds.  Draseena purportedly manages the operations for these six funds and selects their trading manager.  Draseena also purportedly selected foreign exchange dealers and various other administrative entities to provide services for these six funds.  Spitzer, through Draseena, provided investors with false periodic statements and false Schedule K-1s.

20.   **DN Management Co. LLC ("DN")** is a Nevada limited liability company.  Spitzer is the principal and controlling owner of DN, and DN is the manager of Aneesard Management LLC.

21.     **Aneesard Management LLC ("Aneesard") (f/k/a Nerium Management Co. LLC)** is a Nevada limited liability company. Aneesard claims to act as an administrative manager for five of Spitzer's investment funds. Aneesard purportedly manages the operations for these five funds and selects their investment manager. Aneesard also purportedly selected foreign exchange dealers and various other administrative entities to provide services for these five funds. Spitzer, through Aneesard, provided investors with false periodic statements and with false Schedule K-1s.

22.     **Nerium Management Co. ("Nerium Management")** is an Illinois corporation with an address in Stateline, Nevada. Spitzer is the principal and controlling owner of Nerium Management. Nerium Management is general partner for Spitzer's Nerium Currency Fund, LP. Nerium Management purportedly administers the operations of this fund and selects its trading manager. Nerium Management also purportedly selected foreign exchange dealers and various other administrative entities to provide services for this fund. Spitzer, through Nerium Management, also provided investors with false periodic statements and with false Schedule K-1s.

23.     Kenzie Financial, Kenzie Services, Draseena, DN, Aneesard, and Nerium Management are collectively referred to as the "Kenzie Companies."

24.     **Arrow Fund, LLC ("Arrow")** is a Nevada limited liability company. Arrow's private placement memorandum ("PPM") represents to investors that their investment proceeds were to be used to invest in foreign currency forward contracts, private or publicly traded securities issued by financially distressed or insolvent domestic or foreign entities, cash currencies, stocks, bonds, options, and real estate.

25.   **Arrow Fund II, LLC ("Arrow II")** is a Nevada limited liability company.  Arrow II's PPM represents to investors that their investment proceeds were to be used to invest in stock or equity interests in energy and natural resources ventures, and real estate.

26.   **Conservium Fund, LLC ("Conservium")** is a Nevada limited liability company.  Conservium's PPM represents to investors that their investment proceeds were to be used to invest in foreign currency forward contracts, stocks, funds of funds, and U.S. Treasuries.

27.   **Nerium Currency Fund, LP ("Nerium Currency")** is a Nevada limited partnership.  Nerium Currency's PPM represents to investors that their investment proceeds were to be used to invest in foreign currency forward contracts, cross rates, swaps, bonds, funds of funds, stocks, options, and real estate.

28.   **Senior Strength Q Fund, LLC ("Senior Strength")** is a Nevada limited liability company.  Senior Strength's PPM represents to investors that their investment proceeds were to be used to invest in U.S. and foreign treasury securities, foreign currency forward contracts, funds of funds, options, real estate, stocks, and bonds.

29.   **SSecurity Fund, LLC ("SSecurity")** is a Nevada limited liability company.  SSecurity's PPM represents to investors that their investment proceeds were to be used to invest in foreign and domestic government guaranteed money market investments and time deposits.

30.   **Three Oaks Advanced Fund, LLC ("Three Oaks Advanced")** is a Nevada limited liability company.  Three Oaks Advanced's PPM represents to investors that their investment proceeds were to be used to invest in foreign currency forward

contracts, cross rates, swaps, bonds, funds of funds, stocks, options, and real estate. On

March 28, 2001, the Commission instituted settled cease-and-desist proceedings against

Three Oaks Advanced for violations of Section 5 of the Securities Act.

31.    **Three Oaks Currency Fund, LP ("Three Oaks Currency")** is a Nevada

limited partnership. Three Oaks Currency's PPM represents to investors that their

investment proceeds were to be used to invest in foreign currency forward contracts,

bonds, funds of funds, stocks, and warrants.

32.    **Three Oaks Fund, LP ("Three Oaks")** is a Nevada limited partnership.

Three Oaks' PPM represents to investors that their investment proceeds were to be used

to invest in foreign currency forward contracts, bonds, funds of funds, stocks, options,

and real estate. On March 28, 2001, the Commission instituted settled cease-and-desist

proceedings against Three Oaks for violations of Section 5 of the Securities Act.

33.    **Three Oaks Fund 25, LLC ("Three Oaks 25")** is a Nevada limited

liability company. Three Oaks 25's PPM represents to investors that their investment

proceeds were to be used to invest in U.S. Treasuries, foreign currency forward contracts,

funds of funds, options, real estate, stocks, and bonds.

34.    **Three Oaks Senior Strength Fund, LLC ("Three Oaks Senior**

**Strength")** is a Nevada limited liability company. Three Oaks Senior Strength's PPM

represents to investors that their investment proceeds were to be used to invest in U.S.

Treasuries, foreign currency forward contracts, funds of funds, options, real estate,

stocks, and bonds.

35.    **USFirst Fund, LLC ("USFirst")** is a Nevada limited liability company.

USFirst's PPM represents to investors that their investment proceeds were to be used to

invest in U.S. Treasuries, foreign currency forward contracts traded through U.S. banks, funds of funds, options, cash currencies, stocks, and bonds. USFirst further represented that its investments were limited to securities of U.S. issuers.

36.     Arrow, Arrow II, Conservium, Nerium Currency, Senior Strength, SSecurity, Three Oaks Advanced, Three Oaks Currency, Three Oaks, Three Oaks 25, Three Oaks Senior Strength, and USFirst are collectively referred to as the "Kenzie Funds."

### Related Entity

37.     <u>Serrano Unifico (Investments) Ltd. ("Serrano")</u> is an offshore entity registered in Nevis, West Indies. CAPM Inc. is an offshore British Virgin Islands entity that purports to be the investment manager for Serrano. Serrano is a purported fund of funds. Amongst other transactions involving Serrano, Spitzer sent investor proceeds from the Kenzie Funds to Serrano's bank account at MeesPierson Curaçao Bank (f/k/a Fortis Bank (Curaçao) N.V.) in the Netherlands Antilles.

### Investor Solicitations and Representations

38.     From at least 2004 through the present, Spitzer, individually and through the Defendant entities and various sales agents, raised $105,875,029 and had approximately 400 investors. To soliticit investors, Spitzer and the Defendant entities made misrepresentations and failed to advise the investors of material facts. Spitzer and the Defendant entities knew, or were reckless in not knowing, about these misrepresentations and omissions. Further, Spitzer, Kenzie Financial, and Kenzie Services, acting as investment advisers, violated their fiduciary duties to the investors.

39.     Spitzer, individually and through the Defendant entities and various sales

agents, solicited many of the investors through several live presentations each year.

During these presentations, Spitzer explained that he specialized in world currencies,

which he stated was the largest asset class in the world. He also stated that one of his

investment objectives was capital preservation. Spitzer explained that he had exceptional

risk management in place and that he conservatively invested the Kenzie Funds in

various world currencies in contrast to riskier currency traders. Spitzer also told investors

that the Kenzie Funds had never lost money.

40.     Spitzer, through the Kenzie Companies and various sales agents, provided

investors with the PPM for the particular Kenzie Fund for which the investor had been

solicited. The Kenzie Funds' PPMs, in addition to describing the investment objectives

and uses of investor proceeds, described the investment risks, which varied from

conservative, such as capital preservation, to aggressive for particular investment funds'

objectives. Spitzer orally and via certain marketing materials that he distributed through

one of the Kenzie Companies, affirmed that certain Kenzie Funds carried varying levels

of risk.

41.     Before and after providing the investors with PPMs, Spitzer through the

Defendant entities and sales agents provided investors with other marketing materials. In

certain of these materials, Spitzer claimed to oversee the Kenzie Funds' "operation of

international currency investments."

42.     Spitzer's marketing materials touted an investment strategy called the

"Kenzie Methodologies" or "Triversification." Under this strategy, Spitzer

recommended that an investor diversify his or her holdings in three areas: (1) stocks; (2)

11

bonds; and (3) world currencies. Spitzer's marketing materials also claimed that global currency should be the "crucial third leg" of an investor's "investment triangle" that provides stability "independent of the volatility of stocks and bonds."

43.    Spitzer represented to investors both orally and in writing that the Kenzie Methodologies were effective and that in applying these methodologies the Kenzie Funds had never lost money.

44.    In fact, Spitzer provided investors with a Draseena document that listed the annual rates of return for the Kenzie Methodologies from 1981 through June 30, 2009. This marketing document reflected that in applying the Kenzie Methodologies the Kenzie Funds had never suffered a losing year and had three years with annual returns in excess of 100%, with a peak return of 184.15%.

45.    Spitzer, in furtherance of his efforts to cover up his fraud and to create a false impression of legitimacy, also sent his investors currency trading industry information, such as the "Currency Composition of Official Foreign Exchange Reserves" and the International Monetary Fund's special drawing rights (a/k/a SDRs) for different currencies.

46.    After the investors made their investments, Spitzer, via the Kenzie Companies, provided the investors with monthly and quarterly statements and with Schedule K-1s, annually. To cover up his fraud, Spitzer represented in these communications to his investors that their money was profitably invested in foreign currencies. Spitzer's misrepresentations in these documents lulled investors into believing that their investments were profitable. This allowed Spitzer to, amongst other things, avoid or delay investor redemption requests.

12

47.    Spitzer, in violation of his fiduciary duty as an investment adviser, also inflated the assets under management for the Kenzie Funds and communicated this false information to his investors. The Kenzie Funds balance sheets for June 2009 stated that the Kenzie Funds collectively had total assets under management of approximately $249 million. Spitzer also told at least one investor, that the Kenzie Funds collectively had $250 million in assets under management. In reality, as of June 2009, the Kenzie Funds only collectively had $4,101,807 in their bank accounts.

### Spitzer's Uses of Investor Proceeds

48.    Despite the Defendants' representations, the Defendants used $71,886,926 of investor funds to make Ponzi payments to investors as part of a massive fraudulent scheme. In addition, despite his representations that certain Kenzie Funds carried varying degrees of risk, from conservative to aggressive, Spitzer did not fully segregate and carry out separate investment strategies for the respective Kenzie Funds. Spitzer did maintain separate checking accounts for each Kenzie Fund at the Bank of America and at Harris Bank, and then at Wachovia Bank, and initially deposited investor proceeds into the corresponding checking account. However, after that point, Spitzer collectively sent from the Kenzie Funds' checking accounts millions of dollars in investor proceeds to an entity called First Century Fund LLC ("First Century Fund"), to Serrano's bank account in the Netherland Antilles and to Kenzie Financial's bank accounts at the National Bank of Anguilla and the First Bank of Puerto Rico, where the money was commingled.

49.    All of the remaining Kenzie Fund investor assets with First Century Fund were subsequently transferred back to the Kenzie Funds checking accounts or to Serrano.

50.    Prior to January 1, 2004, the Kenzie Funds had $7,989,935 with First Century Fund, where this money was invested in a structured product created and offered by a French financial institution, Lyxor Asset Management ("Lyxor"), through SG Americas Securities LLC, an affiliate of Société Générale S.A. From January 2004 through October 2005, the Kenzie Funds investments with First Century Fund in the Lyxor structured product earned $543,032. During that same timeframe, the First Century Fund did not make any additional investments for the Kenzie Funds in Lyxor. From January 2004 through July 2005, First Century Fund liquidated $8,349,993 from the Lyxor investments and transferred those funds to its bank account. In addition to the money that it received back from the Lyxor investment, First Century Fund also received additional money from the Kenzie Funds. Specifically, from January 2004 to May 2005, Spitzer sent $8,532,896 from the Kenzie Funds' Bank of America checking accounts to First Century Fund's bank account. During this same time period, First Century Fund returned $200,000 to the Kenzie Funds' Bank of America checking accounts. In October 2005, the remaining $182,974 in First Century Fund's Lyxor investments was transferred to Serrano's Lyxor account. The remaining Kenzie Funds investor money that was with First Century Fund was also transferred to Serrano. As of August 2007, First Century Fund's bank accounts had zero balances.

51.    From May 2005 to September 2009, Spitzer sent $64,327,001 from the Kenzie Funds' checking accounts, collectively, to Serrano's offshore bank account at MeesPierson Curaçao Bank (f/k/a Fortis Bank (Curaçao) N.V.) in the Netherlands Antilles.

52.     From September 2005 through December 2008, a total of $12,632,974 in Kenzie Funds investor proceeds was invested by Serrano in a Lyxor structured product. This included the $182,974 transferred from First Century Fund's Lyxor investment to Serrano's account, $500,000 invested by First Century Fund in Lyxor through Serrano's account, and $11,950,000 that Serrano invested in Lyxor. Serrano's Lyxor investments resulted in $3,800,164 in losses, net of dividends. Serrano also invested $1,500,000 in commodities and other financial instruments through Peregrine Financial Group, Inc. ("Peregrine") from November 2008 to April 2009. The Peregrine investments resulted in a net loss of over $270,000. Serrano subsequently liquidated both the Lyxor and Peregrine investments.

53.     From March 2006 to September 2009, Serrano transferred a total of $57,509,800, of the $64,327,001, back to the Kenzie Funds. Spitzer used these funds to contribute towards the $71,886,926 paid back to investors and towards the payment of purported business expenses. On information and belief, Serrano still retains at least $6,817,201 of the Kenzie Funds investors' money.

54.     From October 1, 2008 through September 30, 2009, Spitzer used $16,050,500 from the Kenzie Funds checking accounts, collectively, to invest in Goldman Sachs money market funds through Wachovia Capital Markets, LLC. These investments earned only $9,081 in dividends. Spitzer liquidated and transferred back to the Kenzie Funds $16,048,934 from these investments. Spitzer used these funds to contribute towards the $71,886,926 paid back to investors and towards the payment of purported business expenses.

55.     As of January 1, 2004, Spitzer had $699,548 of the Kenzie Funds invested with Rydex Investments ("Rydex"). These amounts were invested in two Rydex inverse index funds. From January 2004 to June 2009, Spitzer did not make any new investments with Rydex. During that same time, the investments held with Rydex only earned $2,324 for a return of less than 1%. In April 2004, $460,000 was liquidated and transferred to the Kenzie Funds checking accounts at Harris Bank. This money was commingled with other funds at Harris Bank and, from February 2004 to February 2009, $770,324 was transferred out of the Harris Bank accounts to the Kenzie Funds other checking accounts. After February 2009, the Harris Bank accounts generally were inactive and as of September 30, 2009, the Kenzie Funds bank accounts at Harris Bank had a balance of $10,537. In June 2009, the rest of the Rydex investments were liquidated and $241,872 was transferred to the Kenzie Funds Wachovia Bank checking accounts.

56.     The Kenzie Funds checking accounts at Wachovia Bank were tied to Wachovia money market accounts (the "Sweep Accounts") that earned returns ranging from 0.05% to 3.25%. The Kenzie Funds' investor cash that Spitzer did not transfer out of the Wachovia checking accounts was automatically transferred to the Sweep Accounts. From December 2006 to September 2009, $53,612,500 was transferred from the Wachovia checking accounts to the Sweep Accounts and $53,741,217 was transferred back from the Sweep Accounts to the checking accounts. During this time, the Sweep Accounts earned $135,307 in interest. Over time, Spitzer used these funds to contribute towards the $71,886,926 paid back to investors and towards the payment of purported

business expenses. As of June 2, 2010, the Kenzie Funds checking accounts and Sweep

Accounts at Wachovia Bank had a remaining balance of just $15,852.

      57.     Starting in November 2006, Spitzer transferred $11,489,425 from the

Kenzie Funds checking accounts, collectively, to an offshore account at the National

Bank of Anguilla. This money typically only remained at the National Bank of Anguilla

for a few days before being transferred to a Kenzie Financial account at the First Bank of

Puerto Rico. Spitzer also transferred a net total of $3,718,613 directly from the Kenzie

Funds checking accounts to the Kenzie Financial account at the First Bank of Puerto

Rico. Spitzer used this $15,208,038 in investor proceeds to pay purported operating

expenses, including making payments to himself and various sales agents. Lastly, Spitzer

paid a net total of $4,819,024 directly from the Kenzie Funds checking accounts for

various third party business expenses.

      58.     From 2005 to 2009, Spitzer, through the Kenzie Companies, touted to

investors that the Kenzie Funds were realizing returns that ranged between 3.38% to

13.54%. The Kenzie Funds could not have achieved those claimed returns. During that

same timeframe, Spitzer invested less than one third of the approximate $105 million

raised from investors, collectively those investments suffered losses, and then Spitzer

used these funds to contribute towards the over $71 million in Ponzi payments. Spitzer

also used investor proceeds to pay over $20 million in purported expenses. Thus,

Spitzer's touted investment returns are false.

<u>**Spitzer is Avoiding Paying Investor Redemption Requests and
is Continuing his Ponzi Scheme**</u>

      59.     Since at least August 2009 and continuing through to the present, Spitzer

has failed to satisfy investor redemption requests made upon the Kenzie Funds.

60.     Spitzer and at least one of his salespersons have provided different explanations to different investors for the failure to meet redemptions, including that: (1) a criminal investigation of one of the salespersons is delaying the liquidation of assets; (2) the Kenzie Funds are waiting on the valuation of assets by banks or brokerage firms; (3) new FINRA regulations that affected the liquidity of the investments; and (4) certain positions of the Kenzie funds positions are being held to maturity.

61.     Rather than pay the redemption requests, Spitzer is attempting to dissolve the Kenzie Funds. In letters dated April 15, 2010, Spitzer informed investors in the Kenzie Funds that a large number of requests for redemptions had been received. The letters concluded by requesting votes to approve the voluntary dissolution of the Kenzie Funds.

62.     As recently as March 2010, while failing to satisfy overdue pending redemption requests for certain investors, Spitzer approached a USFirst Fund, LLC investor about making a new investment in SSecurity Fund, LLC ("SSecurity").

63.     Spitzer solicited this investor by telling him that SSecurity was different than Spitzer's other funds that invest in foreign currency. He explained to this investor that SSecurity was a more conservative investment as it invested in overseas "bank-secured" notes and that the investor's principal investment would be guaranteed by the banks.

64.     On March 2, 2010, Spitzer sent a letter on Aneesard letterhead to the investor enclosing offering materials for SSecurity. A few weeks later, on March 29, 2010, this investor invested $100,000 with Spitzer for SSecurity.

18

65.     Rather than use this investor's money to invest in "bank-secured" notes through SSecurity, Spitzer used this new investor money to make $9,492 in Ponzi payments to four other investors, transferred $27,102 to the First Bank of Puerto Rico, and paid $26,257 for third party expenses.

66.     On April 21, 2010, the investor wrote a letter to Spitzer directly and requested the redemption of his $100,000 investment in SSecurity. On May 15, 2010, this investor emailed Spitzer, to follow-up on his April 21 letter, and demanded the return of this investment. To date, Spitzer has not returned this investor's $100,000 investment in SSecurity.

### Spitzer Presents a Flight Risk and
### The Threat of the Dissipation of Investor Assets is Great

67.     Spitzer presents a flight risk. While Spitzer is a U.S. citizen residing in a U.S. territory, his residence in the Caribbean provides him with close and easy access to foreign jurisdictions. Spitzer also has relationships with foreign entities and the individuals associated with those entities.

68.     Spitzer has transferred tens of millions of dollars to offshore bank accounts in the Netherland Antilles and in Anguilla. Spitzer also has accounts at financial institutions in Europe. Spitzer also recently misused and, in short order, dissipated the proceeds of an investor. Spitzer also has a propensity to handle and spend large amounts of cash. For example, between March 2006 and October 2009, Spitzer made fourteen trips to the Wynn Las Vegas Casino where he spent over $900,000 in cash. Thus, the threat of the dissipation of assets by Spitzer, the Kenzie Companies, and the Kenzie Funds is significant.

## COUNT I

### Violations of Section 17(a)(1) of the Securities Act
### (Against All Defendants)

69.     Paragraphs 1 through 68 are realleged and incorporated by reference as though fully set forth herein.

70.     By engaging in the conduct described above the Defendants, in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, have employed devices, schemes and artifices to defraud.

71.     The Defendants acted with scienter.

72.     By reason of the foregoing, the Defendants violated Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT II

### Violations of Sections 17(a)(2) and (3) of the Securities Act
### (Against All Defendants)

73.     Paragraphs 1 through 68 are realleged and incorporated by reference as though fully set forth herein.

74.     By engaging in the conduct described above, the Defendants, in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, have:

a.   obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

20

b. engaged in transactions, practices, or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities.

75. By reason of the foregoing, the Defendants have violated Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(2)-(3)].

## COUNT III

### Violations of Section 10(b) of the Exchange Act, and Exchange Act Rule 10b-5 (Against All Defendants)

76. Paragraphs 1 through 68 are realleged and incorporated by reference.

77. As more fully described in paragraphs 1 through 68 above, the Defendants, in connection with the purchase and sale of securities, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly: used and employed devices, schemes and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices and courses of business which operated or would have operated as a fraud and deceit upon purchasers and sellers and prospective purchasers and sellers of securities.

78. The Defendants acted with scienter.

79. By reason of the foregoing, the Defendants violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

## COUNT IV

### Violations of Advisers Act Section 206(1) (Against Spitzer, Kenzie Financial and Kenzie Services)

80. Paragraphs 1 through 68 are realleged and incorporated by reference.

81.     At all times relevant to this Complaint, Spitzer, Kenzie Financial, and Kenzie Services acted as investment advisers to the Kenzie Funds.  Spitzer, Kenzie Financial, and Kenzie Services managed the investments of the Kenzie Funds in exchange for compensation in the form of performance and management fees.

82.     As more fully described in paragraphs 1 through 68 above, at all times alleged in this Complaint, Spitzer, Kenzie Financial, and Kenzie Services, while acting as investment advisers, by use of the mails, and the means and instrumentalities of interstate commerce, directly or indirectly: (i) employed devices, schemes or artifices to defraud its clients or prospective clients; and (ii) engaged in transactions, practices and courses of business which have operated as a fraud or deceit upon their clients or prospective clients.

83.     Spitzer, Kenzie Financial, and Kenzie Services acted with scienter.

84.     By reason of the foregoing, Spitzer, Kenzie Financial, and Kenzie Services have violated Section 206(1) of the Advisers Act. [15 U.S.C. § 80b-6(1)].

## COUNT V

### Violations of Advisers Act Section 206(2)
### (Against Spitzer, Kenzie Financial and Kenzie Services)

85.     Paragraphs 1 through 68 are realleged and incorporated by reference.

86.     At all times relevant to this Complaint, Spitzer, Kenzie Financial, and Kenzie Services acted as investment advisers to the Kenzie Funds.  Spitzer, Kenzie Financial, and Kenzie Services managed the investments of the Kenzie Funds in exchange for compensation in the form of performance and management fees.

87.     As more fully described in paragraphs 1 through 68 above, at all times alleged in this Complaint, Spitzer, Kenzie Financial, and Kenzie Services, while acting as

investment advisers, by use of the mails, and the means and instrumentalities of interstate

commerce, directly or indirectly: (i) employed devices, schemes or artifices to defraud its

clients or prospective clients; and (ii) engaged in transactions, practices and courses of

business which have operated as a fraud or deceit upon their clients or prospective

clients.

88.    By reason of the foregoing, Spitzer, Kenzie Financial, and Kenzie

Services have violated Section 206(2) of the Advisers Act. [15 U.S.C. § 80b-6(2)].

## COUNT VI

### Violations of Advisers Act
### Section 206(4) and Rule 206(4)-8 Thereunder
### (Against Kenzie, Kenzie Financial and Kenzie Services)

89.    Paragraphs 1 through 68 are realleged and incorporated by reference.

90.    At all times relevant to this Complaint, Spitzer, Kenzie Financial, and

Kenzie Services acted as investment advisers to the Kenzie Funds.  Spitzer, Kenzie

Financial, and Kenzie Services managed the investments of the Kenzie Funds in

exchange for compensation in the form of performance and management fees.

91.    As more fully described in paragraphs 1 through 68 above, at all times

alleged in this Complaint, Spitzer, Kenzie Financial and Kenzie Services, while acting as

investment advisers, by use of the mails, and the means and instrumentalities of interstate

commerce, directly or indirectly: engaged in acts, practices or courses of business which

are fraudulent, deceptive, or manipulative.  Spitzer, Kenzie Financial and Kenzie

Services made untrue statements of a material fact or omitted to state a material fact

necessary to make the statements made, in the light of the circumstances under which

they were made, not misleading, to any investor or prospective in the pooled investment

vehicle, and otherwise engaged in acts, practices or courses of business that was

fraudulent, deceptive, or manipulative with respect to any investor or prospective investor in the pooled investment vehicle.

92.     By reason of the foregoing, Spitzer, Kenzie Financial and Kenzie Services have violated Section 206(4) of the Advisers Act. [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 [17 C.F.R. 275.206(4)-8] thereunder.

## RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court:

### I.

Issue findings of fact and conclusions of law that the Defendants committed the violations charged and alleged herein.

### II.

Grant Temporary Restraining Orders and Orders of Preliminary and Permanent Injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, restraining and enjoining the Defendants, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with them who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j] and Rule 10b-5 [17 CFR § 240.10b-5] thereunder.

### III.

Grant Temporary Restraining Orders and Orders of Preliminary and Permanent Injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure,

restraining and enjoining Defendants Spitzer, Kenzie Financial and Kenzie Services, their

officers, agents, servants, employees, attorneys and those persons in active concert or

participation with them who receive actual notice of the Order, by personal service or

otherwise, and each of them from, directly or indirectly, engaging in the transactions,

acts, practices or courses of business described above, or in conduct of similar purport

and object, that violate Sections 206(1), 206(2) and 206(4) of the Advisers Act [15

U.S.C. §§ 80b-6(1) and 80b-6(2)] and Rule 206(4)-8 [17 C.F.R. 275.206(4)-8]

thereunder.

## IV.

Issue an Order requiring the Defendants to disgorge the ill-gotten gains that they

received as a result of the violations alleged in this Complaint, including prejudgment

interest.

## V.

With regard to Defendants Spitzer's, Draseena's, Kenzie Financial's, Nerium

Management's, Aneesard's, and DN Management's violative acts, practices and courses

of business set forth herein, issue an Order imposing upon Spitzer, Draseena, Kenzie

Financial, Nerium Management, Aneesard, and DN Management appropriate civil

penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section

21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## VI.

With regard to Defendants Spitzer's and Kenzie Financial's violative acts,

practices and courses of business set forth herein, issue an Order imposing upon Spitzer

and Kenzie Financial appropriate civil penalties pursuant to Section 209(e) of the

Advisers Act [15 U.S.C. § 80b-9(e)].

## VII.

Retain jurisdiction of this action in accordance with the principles of equity and

the Federal Rules of Civil Procedure in order to implement and carry out the terms of all

orders and decrees that may be entered or to entertain any suitable application or motion

for additional relief within the jurisdiction of this Court.

## VIII.

Grant appropriate emergency relief to prevent further secretion or dissipation of

assets purchased with investor funds.

## IX.

Grant an Order for any other relief this Court deems appropriate.

Respectfully submitted,

Dated: June 17, 2010

James G. Lundy
Natalie G. Garner
Andrew P. O'Brien
Attorneys for Plaintiff
U.S. Securities and Exchange
Commission
Chicago Regional Office
175 West Jackson Blvd.
Suite 900
Chicago, Illinois 60604
(312) 353-7390

26

# Exhibit E

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No. 10 CR 651 |
| | ) | |
| v. | ) | Violations: Title 18, United States |
| | ) | Code, Section 1341 |
| DANIEL SPITZER | ) | |

## COUNT ONE

The SPECIAL AUGUST 2009-2 GRAND JURY charges:

1.    At all times material to this information:

    a.    Defendant DANIEL SPITZER, a resident of St. Thomas, U.S. Virgin Islands, and Barrington, Illinois, was the principal officer and sole shareholder of Kenzie Financial Management, a U.S. Virgin Islands corporation; the sole manager and member of Kenzie Services, LLC ("Kenzie Services"), a corporation located in Charlestown, Nevis, West Indies; the president of Draseena Funds Group, Corp., an Illinois corporation; the manager of DN Management Company, LLC ("DN") , a Nevada limited liability company, and the manager of Nerium Management Company, an Illinois corporation.

    b.    Through these corporate entities, defendant DANIEL SPITZER controlled twelve investment funds: Arrow Fund, LLC; Arrow Fund II, LLC; Nerium Currency Fund, LP; Conservium Fund, LLC; Senior Strength Q Fund, LLC; Three Oaks Senior Strength Fund, LLC; Three Oaks Fund, LP; Three Oaks Currency Fund, LP; Three Oaks Advanced Fund, LLC; Three Oaks

Fund 25, LLC;  US First Fund, LLC, and SSecurity Fund, LLC (collectively known as "the Kenzie Funds").

      c.    Defendant DANIEL SPITZER offered and sold to the public investments in the various Kenzie Funds in the form of membership interests and limited partnership interests.

      d.    Defendant DANIEL SPITZER, through sales agents and various marketing materials, informed investors and potential investors in the Kenzie Funds that their funds would be used to invest primarily in foreign currency trading, that the Kenzie Funds had never lost money, and that the Kenzie Funds had achieved profitable historical returns.

      e.    Defendant DANIEL SPITZER  also informed investors and potential investors, through sales agents and various marketing materials, that after a minimum holding period, they could redeem their investments within a specified period of time, after prior written notice to the fund's administrative manager.

      2.    Beginning no later than in or around 2004, and continuing until in or around July, 2010, at Riverwoods, in the Northern District of Illinois, Eastern Division, and elsewhere,

DANIEL SPITZER,

defendant herein, and others, devised and participated in a scheme to defraud investors and prospective investors, and to obtain money by means of materially

2

false and fraudulent pretenses, representations, and promises, and by means of material omissions, which scheme is further described below.

3.    It was part of the scheme that defendant DANIEL SPITZER engaged in and operated a form of "Ponzi" scheme. That is, the defendant had to continually raise funds through the solicitation of new investors in the Kenzie Funds to make payments on investments made by earlier investors, all of which the defendant concealed and intentionally failed to disclose to both new and earlier investors. As a part of this Ponzi scheme, the defendant fraudulently obtained over $105 million from approximately 400 investors.

4.    It was further part of the scheme that defendant DANIEL SPITZER fraudulently induced and caused to be induced prospective investors to invest approximately $105 million in the Kenzie Funds by representing and causing to be represented that the investors' funds would be used to invest in foreign currencies and other types of investments, when the defendant intended to and did misappropriate a significant portion of the investors' funds, including approximately $71 million to make Ponzi-type payments to earlier investors.

5.    It was further part of the scheme that defendant DANIEL SPITZER falsely represented and caused to be falsely represented to prospective investors and investors that different Kenzie Funds had different levels of risk and different investment strategies, when the defendant intended to and did commingle the money invested in all twelve of the Kenzie Funds,

3

misappropriated a significant portion, and only invested less than one third of the approximately $105 million raised from investors.

6.     It was further part of the scheme that defendant DANIEL SPITZER falsely represented and caused to be falsely represented to prospective investors and investors the expected returns and returns on investments, including that the Kenzie Funds had rates of returns ranging from 4.52% to 13.54% over the last five years. The bank accounts for the Kenzie Funds reflect that the total gross  return  over  the  five  year  period  on  the  approximately  $105 million investors contributed to all of the Kenzie Funds was less than 1% for the entire period.

7.     It was further part of the scheme that defendant DANIEL SPITZER falsely represented and caused to be falsely represented to prospective investors that as of June 30, 2009, the Kenzie Funds were worth approximately $250 million, at a time when the Kenzie Funds collectively had only approximately $4 million in its bank accounts.

8.     It was further part of the scheme that defendant DANIEL SPITZER caused to be created fraudulent account statements and Form K-1s (for use by investors in preparing their federal income tax returns) in which he fraudulently inflated the investors' account balances and rates of return.

9.    It was further part of the scheme that defendant DANIEL SPITZER used and caused the use of the United States Postal Service to deliver the fraudulent account statements and Form K-1s to investors.

10.   It was further part of the scheme that defendant DANIEL SPITZER made Ponzi-type payments to investors, made and caused to be made misrepresentations about the status of investments, and took other steps to lull investors into a false sense of security that their investments were safe and profitable.

Investor A

11.   As an example of the scheme, in or about March, 2010, defendant DANIEL SPITZER fraudulently obtained $100,000 from Investor A, by, among other things, falsely representing that the money would be invested in the SSecurity Fund in foreign currencies and that Investor A could redeem his investment after a 30-day hold period.  Defendant DANIEL SPITZER did not invest or cause to be invested Investor A's money as represented.  Instead, the defendant used $9,492 to make Ponzi-type payments to four other investors, transferred $27,102 to a bank account under the defendant's control, and $26,257 was used for third party expenses.  Moreover, even though Investor A requested in writing a redemption from the SSecurity Fund, he never received it.

5

Investor B

12.     As another example of the scheme, on or about June 17, 2009, defendant DANIEL SPITZER fraudulently obtained $1.5 million from Investor B for an investment in the SSecurity Fund, in part based on misrepresentations about an earlier investment in one of the Kenzie Funds by Investor B. Defendant DANIEL SPITZER never invested Investor B's $1.5 million. Instead, defendant DANIEL SPITZER caused  Investor B's $1.5 million to be deposited into an account in the name of SSecurity Fund, LLC and thereafter transferred most of it into accounts for other Kenzie Funds.  Defendant DANIEL SPITZER caused virtually all of the funds transferred into these accounts from the SSecurity account to be misappropriated to make Ponzi-type payments to other investors.

13.     It was further part of the scheme that when Investor B sought to redeem his investment in the SSecurity Fund, defendant DANIEL SPITZER falsely represented that the redemption might take a little time in order to liquidate Investor B's funds out of the investment and into funds for reimbursement.  Investor B never received a redemption of the $1.5 million.

14.     It was further part of the scheme that defendant DANIEL SPITZER concealed, misrepresented, and hid and caused to be concealed, misrepresented, and hidden, the existence and purpose of the scheme and the acts done in furtherance of the scheme.

6

15.   As a result of the scheme, defendant DANIEL SPITZER fraudulently obtained over $105,000,000 from over 400 investors, misappropriated a significant portion of the funds, including to make about $71 million in Ponzi-type payments, and ultimately caused victims to suffer losses totaling approximately $34 million.

16.   On or about February 21, 2007, at Riverwoods, in the Northern District of Illinois, Eastern Division, and elsewhere,

DANIEL SPITZER,

defendant herein, for the purpose of executing the scheme to defraud, and attempting to do so, knowingly caused to be delivered by U.S. mail an application and private placement memorandum for the Three Oaks Senior Strength Funds, LLC, representing that Investor HG's funds would be invested in U.S. Treasuries, foreign currency forward contracts, cash currencies, stocks, bonds, funds, funds of funds, warrants, options, real estate, preferreds and convertibles to Investor HG at his address in Riverwoods, Illinois;

In violation of Title 18, United States Code, Section 1341.

## COUNT TWO

The SPECIAL AUGUST 2009-2 GRAND JURY further charges:

1.     Paragraphs 1 through 15 of Count One are realleged and incorporated as if fully set out in this count.

2.     In or about the first quarter of 2009, at Riverwoods, in the Northern District of Illinois, Eastern Division, and elsewhere,

DANIEL SPITZER,

defendant herein, for the purpose of executing the scheme to defraud, and attempting to do so, knowingly caused to be delivered by U.S. mail a 2008 Schedule K-1 to Investor HG at his address in Riverwoods, Illinois, purporting to show that for the calendar year 2008, Investor HG's account in the Three Oaks Senior Strength Fund had an ending balance of $299,521;

In violation of Title 18, United States Code, Section 1341.

## COUNT THREE

The SPECIAL AUGUST 2009-2 GRAND JURY further charges:

1.     Paragraphs 1 through 15 of Count One are realleged and incorporated as if fully set out in this count.

2.     On or about December 31, 2008, at Riverwoods, in the Northern District of Illinois, Eastern Division, and elsewhere,

DANIEL SPITZER,

defendant herein, for the purpose of executing the scheme to defraud, and attempting to do so, knowingly caused to be delivered by U.S. mail a quarterly account statement to Investor HG at his address in Riverwoods, Illinois, purporting to show that Investor HG's account in the Three Oaks Senior Strength Fund had a balance of $299,520.63 as of December 31, 2008;

In violation of Title 18, United States Code, Section 1341.

9

## COUNT FOUR

The SPECIAL AUGUST 2009-2 GRAND JURY further charges:

1.     Paragraphs 1 through 15 of Count One are realleged and incorporated as if fully set out in this count.

2.     In or about the first quarter of 2010, at Riverwoods, in the Northern District of Illinois, Eastern Division, and elsewhere,

### DANIEL SPITZER,

defendant herein, for the purpose of executing the scheme to defraud, and attempting to do so, knowingly caused to be delivered by U.S. mail a 2009 Schedule K-1 to Investor HG at his address in Riverwoods, Illinois, purporting to show that for the calendar year  2009, Investor HG's account in the Three Oaks Senior Strength Fund had an ending balance of $312,886;

In violation of Title 18, United States Code, Section 1341.

## COUNT FIVE

The SPECIAL AUGUST 2009-2 GRAND JURY further charges:

1.     Paragraphs 1 through 15 of Count One are realleged and incorporated as if fully set out in this count.

2.     On or about April 30, 2009, at Naperville, in the Northern District of Illinois, Eastern Division, and elsewhere,

### DANIEL SPITZER,

defendant herein, for the purpose of executing the scheme to defraud, and attempting to do so, knowingly caused to be delivered by U.S. mail a quarterly account statement to Investor RO at his address in Naperville, Illinois, purporting to show that Investor RO's account in the Three Oaks Currency Fund account had a balance of $143,099.74 as of March 31, 2009;

In violation of Title 18, United States Code, Section 1341.

## COUNT SIX

The SPECIAL AUGUST 2009-2 GRAND JURY further charges:

1.     Paragraphs 1 through 15 of Count One are realleged and incorporated as if fully set out in this count.

2.     On or about July 20, 2009, at Naperville, in the Northern District of Illinois, Eastern Division, and elsewhere,

DANIEL SPITZER,

defendant herein, for the purpose of executing the scheme to defraud, and attempting to do so, knowingly caused to be delivered by U.S. mail a quarterly account statement to Investor RO at his address in Naperville, Illinois, purporting to show that Investor RO's account in the Three Oaks Currency Fund account had a balance of $145,708.02 as of June 30, 2009;

In violation of Title 18, United States Code, Section 1341.

12

## COUNT SEVEN

The SPECIAL AUGUST 2009-2 GRAND JURY further charges:

1.    Paragraphs 1 through 15 of Count One are realleged and incorporated as if fully set out in this count.

2.    On or about October 27, 2009, at Naperville, in the Northern District of Illinois, Eastern Division, and elsewhere,

### DANIEL SPITZER,

defendant herein, for the purpose of executing the scheme to defraud, and attempting to do so, knowingly caused to be delivered by U.S. mail a quarterly account statement to Investor RO at his address in Naperville, Illinois, purporting to show that Investor E's account in the Three Oaks Currency Fund account had a balance of $116,165.21 as of September 30, 2009;

In violation of Title 18, United States Code, Section 1341.

## COUNT EIGHT

The SPECIAL AUGUST 2009-2 GRAND JURY further charges:

1.     Paragraphs 1 through 15 of Count One are realleged and incorporated as if fully set out in this count.

2.     On or about February 4, 2010, at Naperville, in the Northern District of Illinois, Eastern Division, and elsewhere,

DANIEL SPITZER,

defendant herein, for the purpose of executing the scheme to defraud, and attempting to do so, knowingly caused to be delivered by U.S. mail a quarterly account statement to Investor RO at his address in Naperville, Illinois, purporting to show that Investor RO's account in the Three Oaks Currency Fund account had a balance of $116, 865.21 as of December 31, 2009;

In violation of Title 18, United States Code, Section 1341.

14

## FORFEITURE ALLEGATION

The SPECIAL AUGUST 2009-2 GRAND JURY alleges:

1.     The allegations contained in Counts One through Eight of this information are realleged and incorporated herein by reference for the purpose of alleging that certain property is subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

2.     As a result of his violations of Title 18, United States Code, Section 1341, as alleged in the foregoing information,

DANIEL SPITZER,

defendant herein, shall forfeit to the United States, pursuant to Title 18, United States Code, Section, 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any and all right, title and interest in property, real and personal, which constitutes and is derived from proceeds traceable to the charged offenses.

3.     The interests of the defendant subject to forfeiture pursuant to Title 18, United States Code, Section, 981(a)(1)(C) and Title 28, United States Code, Section 2461(c) include but are not limited to the following property:

a.     Funds in the amount of approximately $34 million.

4.     If any of the property subject to forfeiture and described above, as a result of any act or omission of the defendant:

a.     Cannot be located upon the exercise of due diligence;

15

b.      Has been transferred or sold to, or deposited with, a third party;

c.      Has been placed beyond the jurisdiction of the Court;

d.      Has been substantially diminished in value; or

e.      Has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property, under the provisions of Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c):

a.      the property located at 4017 Wyndwood, Crystal Lake, IL 60014, PIN 19-02-153-001;

b.      the property located at 32 Ketterling Ct., North Barrington, IL 60010, PIN 13-12-403-037;  and

c.      the property located at 1686 Logan Creek Dr., Glenbrook, NV 89413, PIN 1418-22-610-002;

All pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

A TRUE BILL:

_____

FOREPERSON

_____

UNITED STATES ATTORNEY